1   Lorraine Morey / #029443
2   **Morey Law, PLLC**
    910 West McDowell Road
3   Phoenix, AZ 85007
    (602) 464-4808 Telephone
4   (602) 307-5608 Fax
    Lorraine@morey-law.com
5   *Co-counsel for Plaintiff*

6
    Amie Mendoza / # 029599
7   **Law Offices of Amie Mendoza, PLLC**
    9855 S Priest Dr., Ste 102
8   Tempe, Arizona 85284
    Phone:  480-418-7381
9   Fax: 602-926-8899
10  amie.mendoza@mylawaz.com
    *Co-counsel for Plaintiff*
11

                **IN THE UNITED STATES DISTRICT COURT**
12
                    **DISTRICT OF ARIZONA**
13

14

15  CARL R. SEXTON, a married man,        Case No:  2:16-cv-02144-PHX-SPL

16                  Plaintiff

17          v.                            **SECOND AMENDED
                                          VERIFIED COMPLAINT AND
18  CITY OF PEORIA, a municipality; ROY    DEMAND FOR JURY TRIAL**
    MINTER and JANE DOE MINTER;
19  BENNY PINA and JANE DOE PINA;
    JASON CHRISTOFFERSON and  LISA
20  CHRISTOFFERSON; SHANA HIGGINS
    and  FRANK HIGGINS; JOHN DOE AS       (Assigned to the Honorable Steven P.
21  PERSONAL REPRESENTATIVE OF THE        Logan)
    ESTATE OF DAVID LEBO and JOANNA
22  COLLIER; BOBBY WONG and  SHERRY
    WONG; CHRIS WEBB and  KRISTI
23  WEBB; RUSS SCARBOROUGH and
    GINGER SCARBOROUGH; NORMAN
24
25

BACON and JANE DOE BACON; LANCE
CHEDESTER and  TINA CHEDESTER;
JOHN ABBAS and  LYNDSAY ABBAS;
JOHN DOE and JANE DOE I-XX,
                                Defendants.

Plaintiff Carl R. Sexton, by and through counsel undersigned, for his Second

Amended Complaint (" SAC"), alleges as follows:

## PARTIES

1.      Plaintiff Carl R. Sexton ("Sexton"), a married man, is a resident of

Maricopa County, Arizona and has been a resident of Maricopa County, Arizona, at all

times pertinent to this action.

2.      Sexton was employed as a patrol officer with the Peoria Police

Department ("PPD") at all relevant times pertinent to this action.

3.      Defendant City of Peoria (the "City") is a political and legal entity

existing under the laws of the State of Arizona.

4.      The City was, at all relevant times pertinent to this action, Sexton's

employer for purposes of Sexton's rights under 42 U.S.C. §§ 1983, 1988, for violation

of his Fourteenth Amendment rights under the United States Constitution, for violations

of his rights under the Arizona Constitution and all state law claims.

5.      The City can sue or be sued pursuant to Arizona Law.

6.      The City is both directly and vicariously liable (*respondeat superior*) for

the actions of its employees, including PPD personnel.

1
2
3
4
5
6
7
8
9
10
11

7.    At all times relevant in this complaint, Defendants Roy Minter and Jane Doe Minter, Defendants Benny Pina and Jane Doe Pina, Defendants Jason Christofferson and Lisa Christofferson, Defendants Shana Higgins and Frank Higgins, Defendants John Doe as Personal Representative of the Estate of David Lebo and Joanna Collier, Defendants Bobby Wong and Sherry Wong, Defendants Chris Webb and Kristi Webb, Defendants Russ Scarborough and Ginger Scarborough, Defendants Norman Bacon and Jane Doe Bacon, Defendants Lance Chedester and Tina Chedester, Defendants John Abbas and Lyndsay Abbas were employed by PPD, and thereby the City, and were residents of Maricopa County.

12
13
14
15

8.    Defendant David Lebo passed away on or about April 5, 2016.  As of the date of this filing, under belief, a Personal Representative has not been appointed for his estate.  This Complaint will be amended with the name of the Personal Representative once it is known.

16
17

9.    All Defendants are hereinafter collectively referred to as "Defendants".

18
19

10.    Defendant Roy Minter was at all times relevant in this  SAC the Chief of Police of the PPD.  As such he was a policy maker for PPD and thereby the City.

20
21
22

11.    At all times relevant in this SAC, Defendants were acting under the color of statutes, customs, ordinances, and usage of the State of Arizona, County of Maricopa, City of Peoria, and the PPD.

23
24
25

12.    At all times relevant in this SAC, Defendants were acting in the course and scope of their employment.

13.     At all times relevant in this SAC, Defendants were acting in their capacity as individuals and on behalf of and in furtherance of the interests of their respective marital communities.

14.     Each Defendant, except for the City, is sued both in their individual and official capacities.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this matter because the transactions and occurrences complained of occurred and had their principal effect in Maricopa County, Arizona.

16.     Venue is proper pursuant to A.R.S. § 12-401.

17.     Plaintiff has complied with all conditions precedent to filing an action against a public entity pursuant to the Arizona Notice of Claim Statute A.R.S. §12-821.01.

18.     Plaintiff timely served a statutory Notice of Claim, containing sufficient facts to have allowed Defendants to understand the basis about which liability is claimed and specific amount for which the claims could be settled, as required under A.R.S. §12-821.01.  See attached Exhibit A.

19.     More than 60 days have passed since Plaintiff's Notice of Claim was served and Plaintiff has not received a written response from Defendants.

20.     Accordingly, pursuant to A.R.S. §12-821.01(E), the claims are deemed denied.

**INTRODUCTION**

21.     Defendants wrongfully subjected Sexton to a fatally flawed and biased internal criminal investigation, and a fatally flawed and biased internal administrative investigation, the results of which violated Sexton's constitutional, statutory, and common law rights.

22.     Defendants wrongfully defamed Sexton by publishing the results derived from these false and faulty investigations to the Maricopa County Attorney's Office ("MCAO"), with reckless disregard to their truth.

23.     This publication resulted in Sexton's placement on the MCAO Law Enforcement Rule 15 Disclosure Database List, (a/k/a/ the "Brady List", a/k/a the "Liar's List," and a/k/a "Officer Integrity Database") hereinafter referred to as the "Rule 15 Disclosure List."

24.     The placement of Sexton on the Rule 15 Disclosure List resulted in damaging and impugning Sexton's character, credibility, and reputation, as well as causing Sexton's extreme emotional distress.

25.     Additionally, Sexton's employment with PPD was constructively terminated through Defendant's extreme and outrageous actions.

26.     The placement of Sexton on the Rule 15 Disclosure List caused a loss of consortium with Sexton's wife and son.

# GENERAL ALLEGATIONS

## A.    BACKGROUND.

27.    Sexton realleges and incorporates herein all allegations set forth in all previous paragraphs of this  SAC as if fully set forth below.

28.    On October 4, 2014, a single car fatal traffic accident occurred, at the area of 111th Avenue and Union Hills Drive in Peoria, Arizona.

29.    At least ten (10) PPD personnel, two (2) medical examiner personnel, an unknown number of Sun City Fire Department personnel, an unknown number of Surprise Fire Department personnel, and an unknown Western Towing driver responded to the scene of the accident.

30.    Sexton was one of PPD personnel responding to the scene.

31.    The driver of the car, Rodrigo Garcia (the "Decedent"), was pronounced dead at the scene.

32.    The Decedent's wallet contained $685 cash, of which PPD officers at the scene took a photograph.

33.    Approximately 2 hours and 40 minutes later, only $390 was impounded at the PPD Pinnacle Peak facility.

34.    Several months later, the Decedent's wife, Elizabeth Renteria, discovered the discrepancy of $295 when she reviewed the photographs and reports from the traffic accident.

35.    Ms. Renteria contacted Officer Norman Bacon ("Bacon") who then reported Ms. Renteria's complaint to his supervisor, Sergeant James Willis.

36.    On or about March 16, 2015, Defendant Chief Roy Minter ("Minter"), Defendant Deputy Chief Benny Pena ("Pena"), and Defendant Commander Jason Christofferson ("Christofferson") met with Defendant Sergeant Chris Webb ("Webb") from the PPD Professional Standards Unit and advised Webb that the department would conduct an internal criminal investigation regarding the missing money.

37.    At that same meeting, Webb was advised that once the internal criminal investigation was complete, Webb should then proceed with an internal administrative investigation.

38.    To insure the investigations were conducted in a fair and impartial manner, Minter should have requested that an ***independent*** agency be appointed to conduct both the criminal and internal investigations.

39.    However, Minter directed PPD to instead proceed with its own internal investigations, which from the onset, were flawed and biased.

40.    At the traffic accident scene, Defendant Officer Lance Chedester ("Chedester") was assigned as the case agent by Sgt. Russ Scarborough ("Scarborough"), and was therefore in charge of overseeing the investigation.

41.    According to Chedester (in his internal administrative interview), being the case officer for the accident investigation is the "cake job" which entails "making sure that everybody is doing what they're [sic] supposed to be doing."

42.     Medical examiner personnel handed Decedent's wallet and other property to Chedester and Bacon.

43.     Chedester and Bacon noticed a large amount of currency inside the wallet.

44.     Chedester and Bacon removed the currency from the wallet, fanned the currency on the back of a PPD truck, and Bacon proceeded to photograph the currency.

45.     Specifically, the photograph showed the following:

    a.  Two (2) $100.00 bills =        $200.00

    b.  Twenty-four (24) $20.00 bills =  $480.00

    c.  Five (5) $1.00 bills =         $   5.00

    d.  Total 31 bills =                $685.00

46.     Chedester then collected the currency, put the currency back in Decedent's wallet, and states he placed the wallet in a property bag (the wallet and bag hereafter referred to as the "Currency").

47.     The Currency was not counted again until Sexton and Defendant Officer John Abbas ("Abbas") impounded the Currency at the PPD Pinnacle Peak precinct.

48.     The total amount of currency impounded was $390.00.

49.     Specifically, the impound envelope showed the following:

    a.  Two (2) $100.00 bills =        $200.00

    b.  Seven (7) $20.00 bills =       $140.00

    c.  Nine (9) $5.00 bills =         $  45.00

    d.  Five (5) $1.00 bills =         $   5.00

e.   Total 23 bills =                          <u>$390.00</u>

50.     A total of 31 bills were photographed, but only 23 bills were impounded. Apparently,  9 of the photographed $20 bills were replaced with $5 bills and 8 of the photographed $20 bills were missing.

51.     Chedester could not remember if he left the Currency in the PPD truck or if he "walked it back over."

52.     Chedester admitted he could have left the Currency in the unlocked, unattended truck, which was 30 to 40 yards away from the car accident.

53.     Chedester also admitted he could have carried the Currency back to the scene and later gave it to someone.

54.     Sexton and Abbas were tasked to make the notification of Decedent's death to his next of kin.

55.     Sexton was tasked with the notification because he speaks fluent Spanish.

56.     According to the time line in the police reports and the transcripts from the internal investigations interviews, it was approximately *25 to 45 minutes* between the time Chedester says he left the property bag containing the Currency in the unlocked, unattended truck, or gave it to someone, and when the Currency was handed to Sexton and Abbas just prior to their departure to notify the of next kin.

57.     During those *25 to 45 minutes*, the property was unaccounted for because the Currency was left in an unlocked and unattended truck.

58.     Furthermore, no officer could remember who gave the Currency to whom.

59.     Chedester deviated from proper police procedure when he left the Currency unattended in the unlocked truck.

60.     Chedester broke the chain of custody of the Currency the *instant* he left the Currency in the unlocked, unattended truck.

61.     Chedester, as the case agent, knew or should have known that proper precautions were required to secure the Currency.

62.     At a minimum, Chedester should have placed the Currency in an evidence bag, sealed it, and then created a Chain of Custody Receipt.

63.     Additionally, at a minimum, at the time the Currency was photographed or shortly thereafter, Chedester should have notified his superiors about the Currency.

64.     Chedester did none of those things.

65.     Chedester admits he does not remember where he left the Currency or to whom he gave it to, but knows "it eventually it made its way to whoever was going to go over to make the notification."

66.     The Currency could have been taken by anyone at the accident scene, including, but not limited to, 10 PPD officers, 2 medical examiner personnel, an unknown number of Sun City Fire Department personnel, an unknown number of Surprise Fire Department personnel, and a Western Towing driver.

67.     Chedester and Bacon were the officers to take possession of the Currency when the medical examiner personnel handed the Currency over to them.

68.     Other officers interviewed in the internal investigations could not remember who passed the Currency to whom.

69.     Officer Andrew Harrington, an officer at the accident scene, recalled the Currency being handed to Sexton or Abbas but does not remember by whom.

70.     Officer Bobby Wong ("Wong") states he received the Currency from Scarborough and then he, Wong, passed it on to Sexton.

71.     Scarborough adamantly stated he never had the Currency in his possession.

72.     Sexton stated Chedester or Bacon gave the Currency to him.

73.     Anyone, who had in any way, anything to do with the passing of the Currency could have taken the Currency.

74.     It is impossible to determine at what point the $295 became missing.

75.     Therefore, it is impossible to determine who took the Currency.

**B.     THE INTERNAL CRIMINAL INVESTIGATION**

76.     Sexton realleges and incorporates herein all allegations set forth in all previous paragraphs of this  SAC as if fully set forth below.

77.     Defendant Detective David Lebo ("Lebo") and Defendant Detective Shana Higgins ("Higgins") were tasked with conducting the internal criminal investigation into the missing Currency.

78.     Higgins should have recused herself from participating in any investigation of the missing Currency because of her close, very personal relationship with Abbas that extended beyond the office and their duties at PPD.

79.     Higgins knew or should have known that her personal relationship with Abbas was a clear and significant conflict of interest, which therefore disqualified her from participating in the investigations.

80.     Notwithstanding the inappropriate personal relationship between Higgins and Abbas, they had, for years, been law enforcement partners.

81.     Additionally, when Higgins had to perform her street time, as required by PPD, she always bravo'd up (partnered) with Abbas.

82.     Even if Higgins' and Abbas' close personal relationship was not common knowledge among PPD, which Sexton does not concede, it appears that everyone, including Minter, Pina, Christofferson, Lebo, Webb, and Higgins herself, *ignored* the fact that Higgins and Abbas had previously been law enforcement partners.

83.     At the very least, the investigation was biased against Sexton and in favor of Abbas when PPD allowed Higgins to participate in the criminal investigation. .

84.     Higgins' clear conflict of interest and her participation in the investigations tainted the entire investigative process.

85.     Lebo and Higgins considered Sexton and Abbas, the officers who last had control of the Currency, as the only suspects.

86.    Lebo and Higgins *ignored* contradictions in testimony between officers and gave every benefit of the doubt to every officer *except* Sexton.

87.    Lebo and Higgins never considered the first officers, in a long line of officers, who had, or could have had control of the Currency.

88.    Lebo and Higgins never interviewed a key witness, Wong, who stated he personally handed the Currency to Sexton.

89.    During Abbas' initial criminal investigation interview, in which Higgins participated, Abbas stated he does not remember if he ever had the Currency in his possession at all.

90.    Abbas' initial criminal investigation interview can be summed up as "I don't know anything."

91.    However, during Abbas' second internal criminal investigation interview, of which Higgins again participated, Abbas completely changed his tune about the Currency.

92.    Because there was much talk and rumormongering amongst PPD personnel regarding the Currency, Abbas could have easily heard through the PPD grapevine, or from Higgins herself, that it was only he and Sexton being considered as "involved employees."

93.    Armed with that knowledge, Abbas was very eager to throw Sexton, his friend and sometimes partner, under the proverbial bus.

94.    Specifically, Abbas stated in his second internal criminal investigation interview that he knows that Sexton is known to carry an envelope with cash in it. Abbas stated this to deflect suspicion from himself and onto Sexton, inferring Sexton could have had the bills on hand to replace the now missing $20 bills.

95.    However, Abbas' statement regarding the alleged envelope with cash in it was a statement that was uncorroborated by anyone.

96.    During the administrative investigation interviews, Abbas conveniently remembered many more details relating to the accident scene and the notification of the next of kin than he did during his criminal investigation interview.

97.    However, during this same interview, Abbas had little or no memory of details regarding the Currency.

98.    It appears Abbas had been coached by Higgins or by another Defendant involved in the investigation, on what to say and what not to say in the administrative investigation interviews.

99.    Higgins and Lebo concluded their internal criminal investigation and reported that, based on Sexton's body language during Sexton's interview, Sexton should be held accountable for the missing Currency.

100.   Higgins stated that when asked about the missing Currency, Sexton hunched over and paused, and that body language indicated to Higgins and Lebo that Sexton was guilty.

101.    However, this determination was fatally flawed and unreliable from the onset because Higgins' motivation to implicate Sexton was based on her clear conflict of interest and bias in favor of Abbas and her bias against Sexton.

102.    Higgins and Lebo never considered any alternate interpretations of Sexton's body language, other than that Sexton was guilty.

103.    Higgins and Lebo state they have experience in reading body language; yet the fact that no other interpretation was ever considered, reflects that both Higgins and Lebo were biased against Sexton from the onset.

104.    Higgins had ulterior motives to divert suspicion from Abbas and point the finger at Sexton.

105.    Both Higgins and Lebo did not want to tarnish the reputation of any other officer for his or her deviation from standard police procedure and lack of professionalism at the accident scene.

C.      **THE HOSTILE WORK ENVIRONMENT**

106.    Sexton realleges and incorporates herein all allegations set forth in all previous paragraphs of this SAC as if fully set forth below.

107.    During the internal criminal investigation and afterwards, PPD subjected Sexton to an extremely hostile work environment.[1]

108.    Shortly after Sexton's interview with Higgins and Lebo, the work atmosphere dramatically changed against Sexton.

109.    Many officers, who Sexton previously had amicable relationships with, suddenly and without apparent reason, stopped associating with Sexton.

110.    When Sexton entered the PPD's report writing station, which was located adjacent to Higgins' and Lebo's desks, the mood would drastically change.

111.    The officers would be conversing with each other, and *without fail*, every time Sexton entered the area, the conversations would immediately cease and every person would vacate the area.

112.    Various employees of PPD, including Defendants Higgins, Lebo and Abbas, made it known that they blamed Sexton for the missing Currency.

113.    More specifically, in April 2015, Sexton responded to an early morning fatal motorcycle collision at the intersection of W. Thunderbird Rd. and N. 75th Ave in Peoria, AZ.

114.    As Sexton approached the scene to assist, Sexton heard Officer Bauer tell Officer Rauzen that Sexton was the officer had "stole money" from the fatal crash "up North."

115.    Immediately after those statements were made, Sexton was told by either Officer Rob Hall or Officer Matt Miller (officers at the scene) that his assistance at the scene was not needed and that Sexton could go "10-8", which translates to making one's self available for service.

---

[1] The following are examples only and do not include every instance of the PPD outrageous conduct displayed towards Sexton.

116.   The decision to have Sexton go back into service can only be explained by the hostile work environment that PPD allowed because the collision had occurred after the day shift officers had started their shift and the graveyard officers were ending their shifts.

117.   Sexton believes that had those statements regarding the missing money not been made, the officers on the graveyard would have been excited for Sexton to relieve them so they could end their shift.

118.   The officers who were on the scene and who Sexton had amicably worked with in the past were now very cold and uninviting towards Sexton.

119.   On another occasion, after the internal criminal investigation was concluded, Sexton was exiting the south gate of the police station at the same time Higgins was entering.

120.   Sexton waved to Higgins, as he and Higgins had, previous to the internal criminal investigation, been very cordial and friendly.

121.   However, on this occasion, Sexton received an only a very hateful and disgusted scowl from Higgins.

122.   Sexton and Lebo had, prior to the internal criminal investigation, enjoyed an amicable rapport and every time they saw each other, even if only in passing, would always engage in conversation.

123.   However,   approximately   two   weeks   after   the   internal   criminal investigation  was  concluded,  when  Sexton  passed  Lebo  in  the  hallway  outside  the briefing room, Lebo blatantly refused to speak to Sexton.

124.   On   another   occasion,   after   the   internal   criminal   investigation   was concluded,  when  both  Sexton  and  Lebo  were  in  the  men's  locker  room  at  the  police station, Lebo made it very apparent through his silence and facial expression that he was not interested in any interaction with Sexton.

125.   Based on rumors and false innuendo, fellow officers shunned Sexton for taking (albeit falsely) the Currency.

126.   A few weeks after the criminal investigation concluded, Sexton started to hear rumors about Sexton's involvement in the case and received questions from some officers regarding the missing money.

127.   At this point, Sexton and apparently other PPD personnel had not been placed  on  a  "Do  Not  Discuss  Clause"  or  "Notice  of  Investigation"  regarding  the Currency.

128.   However, the  rumor  mill  amongst  PPD  personnel  accused  Sexton  of taking "$15,000 from a purse" that had been "found" at the Decedent's fatal crash scene on October 14, 2014.

129.   Apparently, the rumor mill conjured up a fictitious missing $15,000 taken from a nonexistent purse.

130.   In early May, 2016, this particular version of the story was actually discussed in a public briefing, which included Sexton and approximately 10 other officers.

131.   During this briefing, Officer Jason Smith initiated the discussion by inquiring about this particular version of the story.  The discussion ensued with Officer Caitlyn Smith, Officer Mike Smith, Officer Julian Huck, Officer Hosner, Officer Rachel Gaines, and others in attendance.

132.   Although Sexton's supervisor Sergeant Jon Meck eventually extinguished the conversation, it was blatantly obvious to Sexton that he, Sexton, was blamed for the missing money.

133.   It was evident the internal criminal investigation was not confidential because the rumormongering continued, and the work atmosphere was becoming colder and more uninviting towards Sexton.

134.   It was made abundantly clear to Sexton that the vast majority of PPD officers labeled him as a thief and a liar.

135.   In late April 2015, Higgins and Lebo evidently made their judgments derived from the internal criminal investigation known to the mainstream PPD personnel.

136.   In mid-May 2015, Officer James Novoselec told Sexton that Officer Scott Taylor was spreading rumors at the PPD North Station that Sexton was the one who took the missing money.

137.    Officer Mark Newman ("Newman"), a Peoria Police Officer Association (the "PPOA")  union representative, told Sexton he had heard that the decision for not placing Sexton and Abbas on administrative leave was at the sole discretion of Defendant Minter, who did not want any negative publicity on the PPD.

138.    On another occasion, Sergeant Luis Aponte informed Sexton that the "sergeant's union" speculated that Sexton and Abbas would be terminated after the internal administrative review investigation was concluded.

139.    On or about April 3, 2015, Sexton met with Newman and Sexton asked Newman why the investigation was being handled internally since the investigating detectives and officers were good friends with several, if not all of the officers involved.

140.    Newman stated he had heard that, in spite of the sure impropriety and lack of confidentiality issues, he had heard from PPOA President Mike Faith ("Faith") that Minter wanted to keep the investigation "in house" for fear it would attract negative publicity on PPD.

141.    Upon information and belief, after PPD notified PPOA of the impending internal criminal investigation, and prior to the commencement of the internal criminal investigation, Minter met with Faith, where they discussed Minter's decision to keep the investigation in-house because Minter did not want the negative publicity.

142.    PPD friends of Sexton and his family suddenly stopped talking to them.

143.   Sexton received a text message from Officer Juan Luera-Harris (who was never formally interviewed).  The text message informed Sexton that Lebo had directly asked Luera-Harris if he thought Sexton took the missing money.

144.   The constructive design of the internal criminal investigation sought out to damage, accuse, and effectively force Sexton to resign from PPD.

145.   During and after the internal criminal investigation, the rampant spreading of rumors and the blatant acts of PPD personnel to exclude, alienate, and estrange Sexton constructively terminated Sexton's employment, forcing Sexton to resign.

146.   During and after the internal criminal investigation, the continuous shaming, shunning, and rumors by PPD personnel towards Sexton became so insufferable that Sexton, who has a family of three to support, decided it was in his and his family's best interest for him to pursue looking for new employment.

147.   Sexton subsequently received an offer from an outside employer for employment not involved in law enforcement.

148.   However, Sexton delayed accepting the new position because he hoped the internal administrative investigation would be concluded and he would be exonerated before a decision had to be made on his accepting the new position and leaving the work in law enforcement that he loved.

149.   Sexton believed he would be cleared of any wrongdoing, his name would be cleared, the extreme and outrageous hostile work environment would abate, and he would continue his employment with PPD for many years to come.

150.   On or about May 18, 2015, Sexton was served with an internal Notice of Internal Administrative Investigation, and was scheduled for a mandatory interview.

151.   The interview date was delayed and changed to an undetermined date sometime in the future because Defendant Webb, the investigating officer, was going on vacation.

152.   Sexton, due to the extremely hostile work environment at PPD, was under a tremendous amount of emotional distress.

153.   Concerned for the welfare of his family and himself, and not seeing any other alternative, Sexton accepted the position with the outside employer and resigned from PPD on May 29, 2015.

154.   Sexton's decision to accept other employment was viewed by the investigating officers in the internal administrative investigation as an admission of guilt.

**D.     THE INTERNAL ADMINSTRATIVE AFFAIRS INVESTIGATION**

155.   Sexton realleges and incorporates herein all allegations set forth in all previous paragraphs of this  SAC as if fully set forth below.

156.   Webb was charged with conducting the internal administrative investigation.

157.   Defendant Christofferson, Webb's superior, advised Webb that Lebo had completed the internal criminal interviews of all police personnel who were on the scene of the initial car accident.

158.    Christofferson also advised Webb that Sexton and Abbas, the last officers to have had possession of the Currency, were to be listed as "involved employees" in the internal administrative investigations and all other employees were to be considered "witness employees."

159.    The naming of the "involved employees" was, as described in the above paragraphs, flawed from the onset as the determination was derived from a faulty and biased criminal investigation.

160.    Webb could not be impartial and objective in his investigation because Christofferson already told Webb what Webb's findings should be and who was to be found as the guilty party.

161.    Approximately two weeks after Sexton's resignation, Webb contacted Sexton requesting that Sexton participate in the internal administrative investigation.

162.     Sexton declined the request.

163.    Webb then asked Sexton to take a polygraph.

164.    Based on advice from his then attorney, the fact that no other officer had agreed to take the polygraph, and because of the test's inherent unreliability, Sexton declined to take the polygraph.

165.    In what Sexton believed to be retaliation for his declining to participate in the internal administrative investigation and declining to take the polygraph, Webb speculated to Sexton that the results of Webb's investigation would be sent to the

Arizona Peace Officer Standards and Training Board ("AZ POST") for revocation of Sexton's police certification.

166.    Furthermore, Webb viewed Sexton's decision not to participate in the internal administrative investigation and not to take a polygraph, a test inherently flawed, as an admission of guilt.

167.    Webb issued his internal administrative report, which **sustained** the action against Sexton and cleared Abbas from any wrongdoing.

168.    However, based on the evidence, it was impossible to determine who actually took the Currency, and therefore the case was *unsolvable*.

169.    Webb's report failed to consider that *several* other officers and personnel present at the accident scene had unmonitored access to the Currency, any of whom could have taken the money.

170.    Webb *ignored* blatant contradictions in officers' testimony and gave every benefit of the doubt to every officer *except* Sexton.

171.    Webb's investigation, as instructed by Christofferson, was focused on the persons *last* having possession of the Currency and did not focus at all on the other 12 (or more) people that could have had unmonitored access to the Currency and who could have taken the Currency.

172.    It was easy for Webb to conclude Sexton's guilt because Sexton refused a second interview, declined to take a polygraph, and had already resigned.

173.   When completed, Webb's faulty and biased report was forwarded up the chain of command, including the Disciplinary Review Panel, ending with Minter.

174.   Because they did not want to tarnish PPD's reputation, Minter, Pena, Christofferson, and Webb *ignored* the following:  the clear conflict of interest of Higgins (due to her very personal relationship with Abbas); the previous professional relationship between Higgins and Abbas; Chedester's violations of PPD procedures; the clear contradiction of testimony between many officers; the fact that only the last two individuals known to have possession of the Currency were considered; and the fact that other officers that had access to the unmonitored Currency could have taken the Currency.

175.   Defendants Minter, Pena, Christofferson, Webb, Chedester, Abbas, Higgins and Lebo believed there would be no recourse to them because they could claim immunity for their actions and inactions.

**E.     PUBLICATIONS OF THE FATALLY FLAWED AND FALSE FINDINGS**

176.   Sexton realleges and incorporates herein all allegations set forth in all previous paragraphs of this  SAC as if fully set forth below.

177.   On or about July 9, 2015, Sexton received a letter from MCAO stating in part, that MCAO Law Enforcement Rule 15 Disclosure Database Committee (the "Committee") had reviewed all materials submitted by PPD regarding the missing Currency and that Sexton's name ***shall*** be placed on the Rule 15 Disclosure List.  See attached Exhibit B.

178.    Defendant Minter evidently published or caused to be published the flawed, faulty, and biased findings to the Committee, with reckless disregard as to the truth of the findings.

179.    The Committee then published PPD's flawed, faulty, and biased findings to AZ POST.

180.    On or about August 4, 2015, Sexton received a letter from AZ POST informing Sexton that the AZ POST Board had received information that there may be grounds for discipline against Sexton.  See attached Exhibit C.

181.    The AZ POST letter further stated it would initiate proceedings for disciplinary action concerning Sexton's police certification (just as Defendant Webb predicted).

182.    Sexton appealed to the Committee to reverse its decision to place Sexton on the Rule 15 Disclosure List, because the PPD recommendation was based on flawed, biased, and unreliable investigations.

183.    Despite the evidence of a flawed, biased, and unreliable investigation presented by Sexton, the Committee refused to remove him from the Rule 15 Disclosure List.  See attached Exhibit D.

**COUNT I**
**DEFAMATION**

184.    Sexton realleges and incorporates herein all allegations set forth in all previous paragraphs of this  SAC as if fully set forth below.

185.   Upon information and belief, Defendants made or caused to be made defamatory statements that were false and brought Sexton disrepute, contempt, and ridicule.

186.   Defendants' defamatory statements attacked Sexton's integrity, virtue, and reputation.

187.   Defendants made or caused to be made the false defamatory statements about Sexton, knowing the statements were false and defamatory, and with reckless disregard as to the truth of the statements.

188.   Defendants' false and defamatory statements about Sexton were made or were caused to be made with malice, reckless disregard, or by negligently failing to ascertain the truth of the matter stated.

189.   The false and defamatory statements were published to the Maricopa County Attorney's Office, who in turn, published the statements to AZ POST.

190.   The false and defamatory statements damaged Sexton's reputation in the community and caused Sexton extreme mental and emotional distress.

191.   As a result of these defamatory statements, Sexton has suffered and continues to suffer irreparable harm.

## COUNT II
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

192.   Sexton realleges and incorporates herein all allegations set forth in all previous paragraphs of this  SAC as if fully set forth below.

193.    Defendants intentionally inflicted emotional distress on Sexton.

194.    The conduct of Defendants was at all times extreme and outrageous, intending to cause Sexton to suffer emotional distress and recklessly disregarding the likelihood that such distress would result from their conduct.

195.    As a result, Sexton suffered emotional distress as a direct and proximate result of the conduct of Defendants.

196.    Defendants' actions caused Sexton embarrassment, humiliation, injury to reputation, mental anguish, and severe emotional damages.

## COUNT III
## CONSTRUCTIVE TERMINATION

197.    Sexton realleges and incorporates herein all allegations set forth in all previous paragraphs of this  SAC as if fully set forth below.

198.    Defendants engaged in outrageous conduct through a continuous pattern of discriminatory harassment and improper conduct, against Sexton.

199.    Sexton's working conditions were objectively intolerable, difficult, and unpleasant.

200.    Defendants constructively discharged by its outrageous conduct because that outrageous conduct compelled Sexton to resign.

## COUNT IV
## VIOLATION OF 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT
## (DEPRIVATION OF LIBERTY INTEREST WITHOUT DUE PROCESS AND
## DELIBERATE INDIFFERENCE)

201.    Sexton realleges and incorporates herein all allegations set forth in all previous paragraphs of this SAC as if fully set forth below.

202.    On or about July 21, 2015, Defendants intentionally and maliciously violated Sexton's Fourteenth Amendment rights under the United States Constitution, and Article 2, § 4 of the Arizona Constitution, by depriving Sexton of his liberty interests without due process.

203.    On or about July 21, 2015, Defendants sent a false and defamatory report to the Maricopa County Attorney's Office alleging Sexton was responsible for the missing Currency.

204.    Defendants caused Sexton's name to be placed on a list known as the Rule 15 Disclosure List.

205.    Defendants did not provide Sexton a hearing before branding Sexton as a thief.

206.    Sexton, as a police officer, has a liberty interest in his reputation.

207.    Sexton was entitled to a hearing before the government could deprive Sexton of his liberty interests.

208.    Defendants were deliberately indifferent to and recklessly disregarded Sexton's rights.

209.    Defendant Minter failed to develop a policy or procedure to address potential Rule 15 Disclosure issues as how to handle particular issues which were left to the discretion of employees without adequate training, policy, or guidance.

210.   The lack of training, policies, and guidance directly resulted in the deprivation of Sexton's due process rights.

211.   Therefore, Defendants are directly liable for their conduct.

212.   Sexton was the target of Defendants' flawed, biased, and unreliable investigations; and Defendants acted in a manner to interfere with and deprive Sexton of his constitutional rights.

213.   Defendants' actions conspired to target and wrongfully accuse and name Sexton as taking the Currency.

214.   Defendants, as trained law enforcement personnel, knew their actions would deprive Sexton of his constitutional rights.

215.   Defendants had no adequate justification for treating Sexton in the fashion that is described in this SAC.

**COUNT V**
**VIOLATION OF THE ARIZONA CONSTITUTION**
**(DEPRIVATION OF LIBERTY INTEREST WITHOUT DUE PROCESS AND**
**DELIBERATE INDIFFERENCE)**

216.   Sexton realleges and incorporates herein all allegations set forth in all previous paragraphs of this SAC as if fully set forth below.

217.   At all times, Defendants, as described in this SAC, violated Sexton's State Constitutional Rights.

1
2

**COUNT VI**
**REQUEST FOR EQUITABLE RELIEF**

3
4

218.    Sexton realleges and incorporates herein all allegations set forth in all previous paragraphs of this SAC as if fully set forth below.

5
6
7
8

219.    On or about July 21, 2015, Defendants published, or caused to be published, defamatory statements about Sexton to MCAO, with reckless disregard as to the truth of the statements.

9
10

220.     As a result of that publication, on or about July 21, 2015, Maricopa County and PPD placed Sexton's name on the Rule 15 Disclosure List.

11
12

221.    Being on the Rule 15 Disclosure List indicates an officer's integrity is questionable and is detrimental to an officer's career and reputation.

13
14
15

222.    Defendants caused Sexton to be placed and maintained on the Rule 15 Disclosure List without just cause and without the benefit of due process.

16
17

223.    The placement of Sexton on the Rule 15 Disclosure List has had an incredibly adverse impact on Sexton's reputation as a police officer.

18
19
20

224.    Defendants based their actions on a fatally flawed and flagrantly biased investigation.

21
22

225.    Sexton appealed to the Committee for reconsideration of his placement on the Rule 15 Disclosure List, but was denied.

23
24

226.    Sexton's only remedy to remove his name from the Rule 15 Disclosure List is court intervention.

25

## DEMAND FOR JURY TRIAL

227.   Sexton hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Sexton respectfully prays for relief as follows:

A.   A declaration that Defendants have committed prohibited practices made unlawful by the Fourteenth Amendment of the United States Constitution;

B.   A declaration that Defendants committed prohibited practices made unlawful by Article 2 of the Arizona Constitution;

C.   A declaration that Defendants are liable to Sexton and an award to Sexton of economic and non-economic damages;

D.   An award of compensatory damages for Sexton's economic and non-economic damages;

E.   A declaration that Defendants are liable to Sexton for punitive damages to the fullest extent permitted by applicable law, and an award of appropriate punitive damages;

F.   That this Court exercise its powers to provide equitable relief and order the removal of Sexton from the Rule 15 Disclosure List;

G.   Attorney's fees and costs incurred pursuant to 42 U.S.C. § 1988(b); and A.R.S. § 12-341.01; and

H.   Such other relief as this Court deems just and proper.

1

RESPECTFULLY SUBMITTED this 12th day of July, 2016.

2

3

4
                                    */s/ Lorraine Morey*
5
                                    Lorraine Morey / #029443
                                    **MOREY LAW, PLLC**
6
                                    910 West McDowell Road
                                    Phoenix, AZ 85007
7
                                    (602) 464-4808 Telephone
                                    (602) 307-5608 Fax
8
                                    Lorraine@morey-law.com
9
                                    *Co-counsel for Plaintiff*

10
                                    */s/ Amie Mendoza*
                                    Amie Mendoza / # 029599
11
                                    **LAW OFFICES OF AMIE**
                                    **MENDOZA, PLLC**
12
                                    9855 S Priest Dr., Ste 102
13
                                    Tempe, Arizona 85284
                                    Phone:  480-418-7381
14
                                    Fax: 602-926-8899
                                    amie.mendoza@mylawaz.com
15
                                    *Co-counsel for Plaintiff*

16

17

18

19

20

21

22

23

24

25

1

**CERTIFICATE OF SERVICE**

2

3        I hereby certify that on July 12, 2016, I electronically transmitted the attached

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4     Notice of Electronic Filing to the following CM/ECF registrants in this matter,

including:

5

6

Melinda A. Bird

7     Assistant City Attorney

Office of the City Attorney

8     City of Peoria

8401 West Monroe Street, Room 280

9     Peoria, AZ 85345

10

11    Michael Wawro

Assistant City Attorney

12    Office of the City Attorney

City of Peoria

13    8401 West Monroe Street, Room 280

Peoria, AZ 85345

14

15

16

By: */s/ Karen Shoman*

17

18

19

20

21

22

23

24

25

1 | STATE OF ARIZONA      )
2 |                                      ) ss.
  | County of Maricopa      )
3
4 | <u>VERIFICATION</u>
5 | Carl R. Sexton, being first duly sworn upon oath, deposes and states:
6 | 1.      I am the Plaintiff in the foregoing action;
7 | 2.      I have read and know the contents of the foregoing ~~First~~ Second Amended
8
9 | Verified Complaint;
10 | 3.      The same are true of my own personal knowledge, except as to those
11 | statements made upon information and belief, and as to those, I believe them to be true;
12 | and
13 | 4.      I declare under penalty of perjury that the foregoing is true and correct to
14 | the best of my knowledge and belief.
15 | EXECUTED this _12_ day of _July_, 2016.
16
17
18 | _____
   | Carl R. Sexton
19
20 | SUBSCRIBED AND SWORN TO before me this _12_ day of _July_, 2016 by
21 | Carl R. Sexton.
22 | _____
23 | Notary Public
   | My Commission Expires:
24 | _May 10, 2019_
25

Page 35 of 35

**CHERRI HOFFMAN**
NOTARY PUBLIC, ARIZONA
MARICOPA COUNTY
My Commission Expires
May 10, 2019